**NOT FOR PUBLICATION**

# UNITED STATES DISTRICT COURT
# DISTRICT OF NEW JERSEY

| | |
|---|---|
| TRAVELERS PROPERTY CASUALTY COMPANY OF AMERICA, as subrogee of Goya Foods, Inc., | **OPINION** |
| Plaintiffs, | Civ. No. 08-0444 (WHW) |
| v. | |
| HALLAM ENGINEERING & CONSTRUCTION CORPORATION, MEADOWLANDS FIRE PROTECTION CORP., SALVATORE SCOGLIO, P.E.; PERLEY-HALLADAY ASSOCIATES, INC.; JAMES E. DEBARBIERI ARCHITECTS; JAMES E. DEBARBIERI, R.A.; ABC CORP. 1-10 (fictitious) and JOHN DOES 1-10 (fictitious) | |
| Defendants. | |

**Walls, Senior District Judge**

Defendant Hallam Engineering & Construction Corporation ("Hallam") moves to strike the expert reports and opinion testimony of two of Plaintiff Travelers Property Casualty of America's ("Travelers") liability experts, Joseph Leach and Robert DeVillez, and Plaintiff's claim for other fire loss damages. Travelers opposes the motion. The motion is granted in part and denied in part.

## FACTUAL AND PROCEDURAL BACKGROUND

This is a subrogation action which arises out of a September 9, 2006 fire at a food processing facility of Goya Foods, Inc. ("Goya") in Secaucus, New Jersey. In the fall of 1997, Goya began to construct a large refrigerated storage bean cooler in the warehouse. Hallam was

1

**NOT FOR PUBLICATION**

engaged by Goya to inspect, maintain service, and repair and/or supply replacement parts for Goya's cooling units. Goya hired Meadowlands in late November 1997 to convert the warehouse's existing dry pipe sprinkler system to a wet pipe system and to install dry sprinkler heads in the bean cooler.

Years later, on September 9, 2006, a fire started in the bean cooler with resulting damage. Goya filed a claim with its insurer, Travelers, which paid Goya $3,067,112.47. On January 23, 2008, Travelers brought this action to recover its payment from the two parties allegedly responsible for the fire and its spread: (1) Hallam for its negligent service of the refrigerator equipment, and (2) Meadowlands for its inadequate design of a fire sprinkler system that resulted in excessive fire spread.

Plaintiff Travelers engaged 6 different liability experts against Hallam, including Joseph Leach and Robert DeVillez. These experts provided two general types of testimony: (1) testimony regarding the specific repairs preceding the fire and observations of the equipment after the fire, and (2) their opinions of Hallam's general maintenance procedures and practices. Hallam contends that their opinions and conclusions are irrelevant, prejudicial and introduce improper character evidence under Federal Rules of Evidence 401, 403 and 404. Mot. at 4, 17. Travelers responds that Leach's and DeVillez's evidence satisfies the Daubert standard, and establishes the negligent acts of Hallam's service technician, Michael Longo, as well as a "a pattern and practice of careless service and inspection work" that breached industry standards and Hallam's contract with Goya. Opp. at 1. On October 1, 2012, Hallam filed a motion to strike the written reports of Leach and DeVillez and to bar their testimony at trial. This Court held a Daubert hearing on December 19, 2012.

**NOT FOR PUBLICATION**

Hallam also seeks to preclude Travelers from introducing certain damages-related evidence – the $196,147.55 in costs paid by Travelers to Goya, allegedly to help mitigate Goya's losses from the fire. See Mot. at 2-4; Opp. at 12-14. These costs consist of the fees paid to the Public Adjustment Bureau, an accounting firm, consulting engineers and a salvage company.

**STANDARD OF REVIEW**

*Admissibility of Expert Testimony*

Rule 702 of the Federal Rules of Evidence, as amended in 2000 to incorporate some of the standards set out in Daubert v. Merrell Dow Pharmaceuticals and Kumho Tire Company v. Carmichael, governs the admissibility of expert testimony. 509 U.S. 579, 595 (1993); 526 U.S. 137, 141 (1999).

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Fed R. Evid. 702. The burden is on the party advancing the expert to show that the three prongs of Rule 702 are met by a preponderance of the evidence. In re Paoli R.R. Yard PCB Litig., 35 F.3d 717, 744 (3d Cir. 1994).

The Third Circuit has explained that Rule 702 "embodies a trilogy of restrictions on expert testimony: qualification, reliability and fit." Schneider ex rel. Estate of Schneider v. Fried, 320 F.3d 396, 404 (3d Cir. 2003). Qualification refers to the requirement that the witness possess specialized expertise. The Third Circuit has interpreted this requirement liberally, holding that "a broad range of knowledge, skills, and training qualify an expert." Paoli, 916 F.2d at 855. Second, the testimony must be reliable; the testimony "must be based on the 'methods and procedures of science' rather than on 'subjective belief or unsupported speculation'; the expert

3

**NOT FOR PUBLICATION**

must have 'good grounds' for his or her belief. In sum . . . . an inquiry into the reliability of scientific evidence under Rule 702 requires a determination as to its scientific validity." Id. at 742 (quoting Daubert, 509 U.S. at 591-92). "This does not mean that plaintiffs have to prove their case twice – they do not have to demonstrate to the judge by a preponderance of the evidence that the assessments of their experts are *correct,* they only have to demonstrate by a preponderance of evidence that their opinions are reliable." Id. at 744; W. Am. Ins. Co. v. Jersey Cent. Power and Light Co., No. 03-6161 (WHW), 2008 WL 5244232, at *7 (D.N.J. Dec. 15, 2008). And, finally, the third prong of Rule 702 requires the expert testimony to fit the issues in the case. The expert's testimony must be relevant for purposes of the case and must assist the trier of fact. The Supreme Court has explained in Daubert that "Rule 702's helpfulness standard requires a valid scientific connection to the pertinent inquiry as a precondition to admissibility." 509 U.S. at 591-92. See also Behrend v. Comcast Corp., 655 F.3d 182, 216 (3d Cir. 2011) (under the fitness analysis, the expert's testimony must be "sufficiently tied to the facts of the case that it will aid the jury in resolving a factual dispute.").

*Character and Habit Evidence*

Rule 404 provides that character evidence is "not admissible to prove that on a particular occasion the person acted in accordance with the character or trait." Fed. R. Evid. 404(a)(1). Rule 404(b) further states that "[e]vidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character:"

> Evidence of a person's habit or an organization's routine practice may be admitted to prove that on a particular occasion the person or organization acted in accordance with the habit or routine practice. The court may admit this evidence regardless of whether it is corroborated or whether there was an eyewitness.

**NOT FOR PUBLICATION**

Although the rule does not define "habit" or "routine practice," the Advisory Committee notes with approval the definition of McCormick that habit, "in modern usage, both lay and psychological, is more specific [than character]. It describes one's regular response to a repeated specific situation. A habit . . . is the person's regular practice of meeting a particular situation with a specific type of conduct . . . . The doing of habitual acts may become semi-automatic." Advisory Committee Notes to the Federal Rules of Evidence, Fed. R. Evid. 406.

## DISCUSSION

### 1. Leach and DeVillez Are Qualified to Testify as Refrigeration Specialists

Although Hallam has not challenged Leach's and DeVillez's qualifications, the Court may consider their qualifications sua sponte in its role as gatekeeper to ensure the reliability of the witnesses before it. See United States v. Mornan, 413 F.3d 372, 380-81 (3d Cir. 2005). To ascertain whether a proposed expert is qualified to act as a witness at trial, courts must consider whether the expert has "specialized knowledge" regarding the area of testimony. Fed. R. Evid. 702. The basis for this knowledge "can be practical experience as well as academic training and credentials." Waldorf v. Shuta, 142 F.3d 601, 625 (3d Cir. 1998). The Third Circuit has interpreted the specialized knowledge requirement liberally. Paoli, 35 F.3d at 741.

Mr. Leach is a professional engineer with licenses in both New Jersey and New York. He holds a North American Technician Certification for the following specialties: air condition, air distribution, air to air heat pumps, and gas furnaces. Mr. DeVillez has worked in the industrial refrigeration industry for fifty years. He attended refrigeration system school at the Los Angeles Trade Technical School before beginning his career as a refrigeration system operator/maintenance technician. He ultimately became the Chief Engineer and subsequently the Vice President of Engineering at Pacific Cold Storage. Leach's and DeVillez's respective

**NOT FOR PUBLICATION**

curriculum vitae and extensive experience with refrigeration units, see Gallin Cert, Ex. C and Nussbaum Cert., Ex. F, qualify them as specialists who have the knowledge necessary to review and opine on the circumstances surrounding the servicing of the Goya refrigeration system.

**2. Leach's Testimony Does Not Rest on Sufficiently "Good Grounds"**

    **a. Reliability Standard**

Next, the Court needs to determine whether Leach's and DeVillez's opinions are reliable and trustworthy. For an expert opinion to be reliable, it must be based on "valid reasoning and reliable methodology. . . . The analysis of the conclusions themselves is for the trier of fact when the expert is subjected to cross-examination.'" Oddi v. Ford Motor Co., 234 F.3d 136, 146 (3d Cir. 2000). In exercising its "gatekeeper" function under Daubert, the district court must ensure "an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." Kumho, 526 U.S. at 152. A "judge should not exclude evidence simply because he or she thinks that there is a flaw in the expert's investigative process which renders the expert's conclusions incorrect. [A] judge should only exclude the evidence if the flaw is large enough that the expert lacks 'good grounds' for his or her conclusions." Paoli, 35 F.3d at 746. Where an expert witness's "factual basis" is "called sufficiently into question . . . the trial judge must determine whether the testimony has a reliable basis in the knowledge and experience of the relevant discipline." United States v. Watson, 260 F.3d 301, 307 (3d Cir. 2001).

The Third Circuit has provided factors that a trial judge may consider in determining reliability:

> Whether a method consists of a testable hypothesis; 2) whether the method has been subject to peer review; 3) the known or potential rate of error; 4) the existence and maintenance of standards controlling the technique's operation; 5) whether the method is generally accepted; 6) the relationship of the technique to methods which have been

   established to be reliable; 7) the qualifications of the expert witness testifying based on the methodology; and 8) the non-judicial uses to which the method has been put.

Paoli, 35 F.3d at 742. In Kumho, the Supreme Court concluded that the trial court *may* consider one or more of the specific factors discussed earlier but also emphasized that "the test of reliability is 'flexible,' and Daubert's list of specific factors [listed above] neither necessarily nor exclusively applies to all experts or in every case. Rather, the law grants a district court the same broad latitude when it decides *how* to determine reliability as it enjoys in respect to its ultimate reliability determination." Kumho, 526 U.S. at 141. Furthermore, these factors are neither exhaustive nor applicable in every case. Kannankeril v. Terminix Int'l, Inc., 128 F.3d 802, 806-07 (3d Cir. 1997).

   **b. Leach's Report & Testimony**

  The hearing confirmed this Court's impression from the initial reading of briefs submitted that Leach's assertions are heavily clothed in speculation, and lacking proper foundation. See Schulz v. Celotex Corp., 942 F.2d 204, 208 (3d Cir. 1991) (warning that expert testimony must be to a reasonable degree of professional certainty or probability); Schneider v. Fried, 320 F.3d 396, 404 (3d Cir. 2003) (in determining reliability, the court must focus on whether the expert's conclusion is "based on the methods and procedures of science rather than on subjective belief or unsupported speculation.") (internal quotation marks omitted); Worrell v. Elliott & Frantz, 799 F. Supp. 2d 343, 349 (D.N.J. 2001) ("[A]n expert opinion based upon speculation, possibilities or contingencies is inadmissible.")

  In his written report, Leach only sporadically refers to the manufacturer's technical guide and other industry articles to support his conclusions. As example, he does base his conclusion that the "leak testing methods employed by Mr. Longo fell below industry standards" (Mot., Ex. A at 7) on the manufacturer's technical guide (id., Ex. A at 8), but then follows with the

unsupported assertion that Longo "did not properly clean and wash all surfaces in and around the evaporator unit to make sure that all oil residue and any remaining refrigerant was eliminated" (id., Ex. A at 9). Upon Leach's inspection of the evaporator units in December 2009, he concluded that Hallam should have discovered certain problems and ordered new parts (id., Ex. A at 12). The basis for this conclusion is unclear. Finally, Mr. Leach provides no basis for his conclusions regarding Mr. Fagan's testimony (id., Ex. A at 13-14).

Although this goes more to relevance and fit than reliability, this Court would be remiss in not observing that the majority of Leach's testimony focuses on issues not relevant to the case, such as whether Hallam violated the Clean Air Act and the history of problems with the compressors at the Goya factory (which were not involved in the fire). Leach Tr. 29:16-24. During his deposition, Leach, in response to the question of what caused the fire, answered that "there was a lot of oil in the drain line where it doesn't belong." Id. 19:15-19. When asked if this caused the fire, he said he didn't know. Id. 19-21-25. Later in the deposition, Leach further admits that his observation of oil occurred three months after the fire, after the equipment was damaged. Id. 24:7-8. He conceded that while certain electrical equipment was "run[ning] hotter than it should," he could not say whether that had an effect on the fire. Id. 32:17-23. With regard to Longo's repairs the night before the fire, Leach testified that he did not know "whether his repair worked or didn't work." Id. 44:1-11. These opinions are too heavily clothed in speculation and doubt to be admissible.

### c. DeVillez's Report & Testimony

DeVillez's written report more clearly lays out his methodology and sources. See Mot., Ex. C. His theory is that a leak of refrigerant and oil occurred, vapors from the oil leaked out and were ignited by an unknown source. DeVillez Tr. 19:17-20:16. DeVillez's conclusion that there

8

**NOT FOR PUBLICATION**

was refrigerant and oil leakage is supported by his review of Hallam's service history records and the testimony of its representatives (Mot., Ex. C at 5). Similarly, his observations regarding Longo's alleged negligence are all based on Longo's deposition testimony and Hallam's records (id., Ex. C at 8-9). DeVillez also relies on the manufacturer's instruction bulletins (e.g., id., Ex. C at 10) and recommendations (e.g., DeVillez Tr. 31:6-12, 32:18-20, 33:4-7).

### 3. Even Though DeVillez's Testimony Is Reliable, It Would Not Be Relevant and Helpful to the Jury

Since the Court has found that the testimony of Leach failed to satisfy the reliability prong of Rule 702, the fit analysis is moot because the Supreme Court has held that, for expert testimony to be admissible, it must be both reliable *and* relevant. Daubert, 509 U.S. at 589. The Court must engage in the fit analysis for DeVillez before determining that the testimony is admissible.

The "fit" requirement is a question of whether "the expert's testimony [is] relevant for the purposes of the case and [will] assist the trier of fact." Schneider ex rel. Estate of Schneider v. Fried, 320 F.3d 396, 404 (3d Cir. 2003). The fitness standard is "not that high" but is "higher than bare relevance." In re Paoli, 35 F.3d at 745. The opinion must be "sufficiently tied to the facts of the case that it will aid the jury in resolving a factual dispute." Behrend v. Comcast Corp., 655 F.3d 182, 216 (3d Cir. 2011).

When asked at his deposition what caused the fire, DeVillez initially said there was oil on the evaporator surfaces, which was warmed, and then exposed to some type of unknown ignition source. See DeVillez Tr. 9:22-12:5. DeVillez testified that one possible source of the oil was the solenoid valve, but he was unable to comment on whether there was leaking from anywhere else in the unit. Id. 19:17-21:15. Most importantly, DeVillez acknowledges that he was not sure if the oil near the valve had any connection to the fire. Id. 36:5-18. He was also unsure whether the

9

**NOT FOR PUBLICATION**

leak began before or after Longo's repairs.

> Q: Now, the oil which was the source of the fuel for this fire, did it get into the evaporator before the repair was done or after
> A: Definitely some before the repair was made.
> Q: Did any get in after the repair was done?
> A: Speculation on my part.

Id. 30:9-22. Additionally, Longo's failure to use the manufacturer's recommended tool to repair the solenoid valve does not necessarily mandate that his repair failed. In fact, there is no evidence that Longo's repair failed.

It follows that the connection between the solenoid valve and the fire is speculative, and insufficient to meet the relevant/fit standard. See State Farm Fire and Cas. Co. v. Holmes Prods., 165 Fed. Appx. 182 (3d Cir. 2006) (excluding expert's testimony regarding cause of fire, that a large dog could have accidently pulled window draperies over a halogen lamp or knocked over the lamp, since it did not satisfy Daubert requirements and was merely unsupported speculation); see also Trabbold v. Mike's Hard Lemonade, No. 09-4235, 2011 WL 2117605 (E.D. Pa. May 26, 2011).

### 4. Leach's and DeVillez's General Maintenance Testimony Is Inadmissible Under Federal Rule of Evidence 403

Both reports of DeVillez and Leach also include their respective opinions on the alleged general maintenance failures by Hallam. Travelers maintains that such testimony is relevant and admissible under Federal Rule of Evidence Rule 406, but relies only on Wigmore's evidence treatise and a First Circuit case for this proposition. Travelers argues that evidence of other allegedly negligent repairs is relevant to show Hallam's "habit" since they are "numerous enough to 'base an inference of systemic conduct.'" Opp. at 20. Hallam responds that the proffered evidence is not habit evidence, but character evidence, and inadmissible under Federal Rule of Evidence 404. Reply at 10. Specifically, Hallam contends that such evidence is not based

10

**NOT FOR PUBLICATION**

on a repeated response to the same situation, but involves repairs to different items (compressor, solenoid valve, etc.): "Proof of a problem with a compressor does not establish a habit by Mr. Longo in responding to a leaking solenoid valve." Id. at 12.

The Third Circuit offers little to no guidance on this topic. The New Jersey Supreme Court[1] has approved the following distinction between habit and character evidence:

> The two are easily confused. People sometimes speak of a habit for care, a habit for promptness, or a habit of forgetfulness . . . . Evidence of these 'habits' would be identical to the kind of evidence that is the target of the general rule against character evidence. Character is a generalized description of a person's disposition, or of the disposition in respect to a general trait, such as honesty, temperance or peacefulness. Habit, in the present context, is more *specific*. It denotes one's *regular response to a repeated situation* . . . . A *habit* . . . is the person's *regular practice of responding to a particular kind of situation with a specific type of conduct*.
>
> [235 N.J. Super. at 564, 563 A.2d 856 (quoting McCormick on Evidence, § 195 at 574-75 (3d ed. 1984) (footnotes omitted)) (emphasis added).]

Sharpe v. Bestop, Inc., 730 A.2d 285, 285-86 (N.J. 1999).

As this Court observed during the hearing, the opinions being put forth by Leach and DeVillez do not involve a repeated response to the same situation, but repairs and lack of preventative maintenance in a variety of different situations. Hallam's "disposition" or "character" is not at issue. In the District of Colorado case, Muller v. Jackson Hole Mountain Resort Corporation, the plaintiff was hurt on a gondola. No. 01-CV-168, 2003 WL 25764892 (D. Colo. May 20, 2003). Plaintiff's expert proffered a series of general maintenance problems as well as a lack of record keeping, as in this case, as proof of negligence: "The reason I find this significant is that it's reflective of a general policy of neglect to attend to safety issues." Id. at *1. Defendant, in response, contended that such opinions were causally unrelated to the incident, hence irrelevant and subject to the provisions of Federal Rules of Evidence 401, 402 and 404(b). Id. at *2.

---

[1] New Jersey's Rules of Evidence are based on the Federal Rules of Evidence.

11

**NOT FOR PUBLICATION**

The District of Colorado concluded that the general observations and references to maintenance lapses that were not directly related to the accident were irrelevant and prejudicial under Federal Rule of Evidence 403. Id. at *2-*4. "Plaintiffs' expert, Peter Leffe, purports to opine on a 'pattern of general disregard for safety' attributable to the defendants. However, such is not an issue before the Court. The only issue before the Court is the defendant's alleged disregard for safety on February 3, 2001. Again, the condition of the subject gondola at the time of plaintiffs' expert's inspection is not relevant to the merits of the instant action. Accordingly, plaintiffs' expert will not be permitted to testify as to any sort of 'general pattern' of negligence." Id. The Court did not reach Federal Rule of Evidence 404.

Although Leach and DeVillez also offered testimony specific to the incident in this case, a significant portion of their reports and respective testimony concerned Hallam's general maintenance practices, and was similar to the testimony at issue in Muller. Such evidence might well sway a jury, thereby giving Plaintiff Travelers an unfair advantage. Fed. R. Evid. 403; see Coleman v. Home Depot, Inc., 306 F.3d 1333, 1343-44, n.6 (3d Cir. 2002) ("[T]he prejudicial effect of admitting the evidence must rise to the level of creating an unfair advantage for one of the parties for the evidence to be excluded under Rule 403."). It follows that Leach and DeVillez will not be permitted to testify to any general pattern of negligence by Hallam.

**5. Hallam's Motion to Strike Other Fire Loss Expenses is Granted in Part and Denied in Part**

Included among the $3,109,553.74 that Travelers paid to Goya was $196,147.55 for "other fire loss expenses." The $196,147.55 includes:

- $21,319.82 paid to Morgan, Johnson, Carpenter & Co. ("Morgan");
- $54,412.79 paid to Madsen, Kneppers & Associates, Inc. ("Madsen");
- $12,889.26 paid to Sentry Salvage ("Sentry"); and

**NOT FOR PUBLICATION**

- $107,526.76 paid to the Public Adjustment Bureau.

Morgan was retained by Travelers to confirm the business and stock loss suffered as a result of the September 9, 2006 fire. Madsen, an engineering and construction consulting firm, was retained four days after the fire to aid Goya in estimating the costs to repair its fire-damaged facility. Madsen also monitored the later repairs. John Cleary of Sentry was retained by Travelers to determine what products and materials could be salvaged from the fire. Finally, the Public Adjustment Bureau was hired by Goya to negotiate with Travelers, and assisted Goya in taking inventory, securing estimates, evaluating any structural damage to the building, and hiring a cleaning company.

As expressed during the hearing and found at oral argument, this Court denies Hallam's motion to strike the $21,319.82 paid to Morgan, the $54,412.79 paid to Madsen, and the $12,889.26 paid to Sentry. See Oritani Sav. & Loan Assoc. v. Fidelity & Deposit Co. of Maryland, 744 F. Supp. 1311, 1321 (D.N.J. 2011) (reasonable costs incurred by a plaintiff in an attempt to mitigate losses that were proximately caused by a defendant's negligence are recoverable as an element of damages), rev'd on other grounds, 989 F.2d 635 (3d Cir. 1993); S.J. Groves & Sons Co. v. Warner Co., 576 F.2d 524, 528 (3d Cir. 1978) (a party is entitled to recover expenses incurred in mitigation of damages). But this Court grants the motion to strike the $107,526.76 paid to the Public Adjustment Bureau, because the Bureau was acting in its normal function as agent for Plaintiff. See Bus. Computer Res. v. Great Wall of Tinton Rd., Inc., 2009 WL 2426344, at *8-*9 (N.J. Super. A.D. Aug. 10, 2009) (barring the public adjuster's fees as an element of damages). "We think it clear that the costs plaintiff incurred in hiring Coe to adjust its claim with its own insurer are not damages recoverable as a result of defendant's negligence." Id. at *8.

**NOT FOR PUBLICATION**

## CONCLUSION

The motion to strike the expert reports and opinion testimony of Joseph Leach and Robert DeVillez is granted. The motion to strike the other fire loss expenses is granted with respect to the $107,526.76 paid to the Public Adjustment Bureau, but denied with respect to the $21,319.82 paid to Morgan, the $54,412.79 paid to Madsen, and the $12,889.26 paid to Sentry.


January 2, 2013

                                               **/s/ William H. Walls**
                                               United States Senior District Judge